## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMES A. HARRINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-0476 (ABJ) |
| | ) | |
| HUGH HALPERN, Director, | ) | |
| *U.S. Government Publishing Office*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

On February 25, 2019, plaintiff James Harrington brought this six-count action against Herbert H. Jackson, Jr., the Acting Deputy Director of the Government Publishing Office ("GPO" or the "agency"),[1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* The case arises out of plaintiff's employment at the GPO between 2014 and 2016. In Counts I and II, he alleged that he was subjected to a hostile work environment based on his race and prior Equal Employment Opportunity ("EEO") activity. Compl. [Dkt. # 1] ¶¶ 45, 50. In Counts III through VI, plaintiff alleged that his supervisors took actions against him in retaliation for his protected activities. Compl. ¶¶ 55, 60, 65, 70.

On June 4, 2019, defendant moved to dismiss Counts I through V for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *See* Def.'s Mot. to Dismiss Compl. in Part [Dkt. # 5]. The Court granted the motion on March 27, 2020, *see* Order (Mar. 27, 2020) [Dkt. # 8]; Mem. Op. (Mar. 27, 2020) [Dkt. # 9], so only Count VI of the complaint remains. Count VI alleges that

---

1       The current Director of the GPO, Hugh Halpern, was automatically substituted as defendant pursuant to Federal Rule of Civil Procedure 25(d).

defendant suspended the plaintiff for four days in retaliation for his prior EEO activity and in violation of Title VII.  Compl. ¶¶ 70–72.

On May 30, 2021, defendant moved for summary judgment.  Mot. for Summ. J. [Dkt. # 22], Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 22-1] ("Def.'s Mot.").  The motion has been fully briefed.[2]  Since plaintiff has not come forward with evidence that would support a finding that defendant's stated reasons for the personnel action were merely pretextual, the motion for summary judgment will be **GRANTED**.

## BACKGROUND

During the time period involved in this case, James Harrington, who describes himself as "White, Caucasian," has been employed in the Press Division of the GPO.  *See* Dep. of James W. Harrington, Ex. 1 to Pl.'s Opp. [Dkt. # 23-1] ("Harrington Dep.") at 5:16–17, 9:13–10:12[3] (conducted on February 4, 2021).[4]  Since August 10, 2014, his immediate supervisor has been Christopher Mitchell.  Harrington Dep. at 15:3–11.

On February 25, 2014, plaintiff initiated an EEO complaint against two upper-level managers named Gary Estep and Melinda Ford.  Pl.'s Statement of Facts ¶ 1, Pl.'s Opp. ("Pl.'s

---

2      *See* Pl.'s Opp. to Def.'s Mot. for Summ. J. [Dkt. # 23] ("Pl.'s Opp."); Reply Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 25] ("Def.'s Reply").

3      Unless otherwise indicated, citations to page numbers in exhibits are to the original page numbers.

4      Defendant also submitted excerpts of plaintiff's February 4, 2021 deposition.  *See* Excerpts of Dep. of James W. Harrington, Ex. 6 to Def.'s Mot. [Dkt. # 22-6].

SOF") at 5–7, citing Harrington Dep. at 15:24–16:11.[5]  Plaintiff alleged in the EEO complaint that

he was subjected to unlawful discrimination by Estep and Ford on the basis of his race.  *See*

Harrington Dep. at 16:22–17:16; Pl.'s SOF ¶ 1; Def.'s Resp. to Pl.'s SOF ¶ 1.

On November 10, 2015, plaintiff was involved in a dispute with another GPO employee

named Timothy Burke, who, like plaintiff, is Caucasian.  Def.'s SOF ¶ 1; Pl.'s Resp. to Def.'s

SOF ¶ 1; Aff. of Christopher L. Mitchell, Ex. 4 to Def.'s Mot. [Dkt. # 22-4] ("Mitchell Aff.") ¶ 11

(noting Burke's race); Harrington Dep. at 23:24–25 (same).  Each employee alleged that "the other

had engaged in unprofessional and discourteous conduct on the floor of the press room."  Def.'s

SOF ¶ 1, citing Letter from Christopher Mitchell, Supervisor, Press Div., to James Harrington

(Mar. 16, 2016), Ex. 1 to Decl. of LaTonya Hayes, Def.'s Mot. [Dkt. # 22-5] ("Notice of Proposed

Suspension") (executed on May 27, 2021);[6] Pl.'s Resp. to Def.'s SOF ¶ 1.  Plaintiff and Burke

reported the incident to Mitchell through written statements, each providing a differing account of

---

5       Defendant submitted a statement of material facts – as to which it contends there is no
genuine issue – in support of its motion for summary judgment.  *See* Def.'s Statement of
Undisputed Material Facts in Supp. of Mot. for Summ. J., Def.'s Mot. [Dkt. # 22-2] ("Def.'s
SOF") ¶¶ 1–11.  Plaintiff filed a response, as well as a statement of material facts, Resp. to Def.'s
Statement of Undisputed Facts, Pl.'s Opp. ("Pl.'s Resp. to Def.'s SOF") at 2–5; Pl.'s SOF, and
defendant filed a reply.  Resp. to Pl.'s Statement of Additional Facts, Def.'s Reply [Dkt. # 25-1]
("Def.'s Resp. to Pl.'s SOF").

        Pursuant to Local Civil Rule 7(h)(1), "[i]n determining a motion for summary judgment,
the Court may assume that facts identified by the moving party in its statement of material facts
are admitted, unless such a fact is controverted in the statement of genuine issues filed in
opposition to the motion."

6       Plaintiff also submitted as an exhibit the May 27, 2021 declaration of LaTonya Hayes, who
is an attorney in GPO's Office of General Counsel.  *See* Decl. of LaTonya Hayes, Pl.'s Opp.
[Dkt. # 23-4].

what occurred.[7]  Def.'s SOF ¶¶ 2–3, citing Remote Dep. of Christopher Mitchell, Ex. 8 to Pl.'s

Opp. [Dkt. # 22-8] ("Mitchell Dep.") at 26–27;[8] Pl.'s Resp. to Def.'s SOF ¶¶ 2–3; *see* Harrington

and Burke Statements; *see also* Harrington Dep. at 23:18–26:13.  Prior to November 10, 2015,

Mitchell was aware that plaintiff had previously engaged in EEO activity.  Pl.'s SOF ¶ 2, citing

Harrington Dep. at 22:1–23:12; Def.'s Resp. to Pl.'s SOF ¶ 2.

Mitchell spoke with witnesses to the incident, as well as both Harrington and Burke.

Mitchell Aff. ¶¶ 9, 26; *see* Harrington Dep. at 35:13–36:3.  The witnesses provided varying

accounts that supported both employees.  Harrington Dep. at 35:13–36:3.  After reviewing the

---

[7]     What occurred on November 10, 2015 remains disputed.  *See* Pl.'s SOF ¶¶ 2–4; Def.'s
Resp. to Pl.'s SOF ¶¶ 2–4.  In plaintiff's version of the events, "while working on the color press
. . . , [he] was approached by Mr. Burke while [he] was searching for a deletion pen."  Pl.'s
SOF ¶ 3, citing Ex. 3 to Pl.'s Opp. [Dkt. # 23-3] ("Harrington and Burke Statements") at 1–2.
Burke asked about the whereabouts of another employee, plaintiff informed Burke that the
employee was "out smoking," and so Burke "turned off the feeder to the color press."  Pl.'s
SOF ¶ 4, citing Harrington and Burke Statements at 1.  Plaintiff asked why Burke turned off the
feeder, and Burke allegedly answered "that there was 'not a fucking operator here.'"  Pl.'s SOF ¶ 5,
citing Harrington and Burke Statements at 1.  Then, plaintiff said that Burke "started walking
towards [him] asking if [he] had a fucking problem with that," while pointing aggressively and
acting as though he would hit plaintiff.  Harrington and Burke Statements at 1; *see* Pl.'s SOF ¶ 6.
Burke told plaintiff "not to ask stupid fucking questions," and plaintiff informed him he would
report his behavior to management.  Harrington and Burke Statements at 1–2.

        Burke reported that he did turn off the feeder, but after he "started to walk away," plaintiff
asked him why he "shut the fucking press off."  Harrington and Burke Statements at 3.  Burke then
answered that there was no operator and told plaintiff not to ask him "stupid questions."  *Id.*
According to Burke, plaintiff responded that he could "ask any fucking question [he] want[ed],"
told Burke that he could not talk to him that way, and later told him that he "ha[d] [his] ass this
time."  *Id.*

        Defendant acknowledges that plaintiff's "account of the incident on November 10, 2015, .
. . [is] disputed by Burke's account of what transpired," but that the "dispute as to what transpired
as between Harrington and Burke does not create a genuine dispute that precludes summary
judgment."  Def.'s Resp. to Pl.'s SOF ¶ 3.

[8]     Plaintiff also submitted excerpts of Mitchell's March 23, 2021 deposition.  *See* Excerpts of
Dep. of Christopher Mitchell, Ex. 7 to Pl.'s Opp. [Dkt. # 23-7].

employees' written complaints, interviewing the witnesses, and consulting with the Employee Relations Division at the GPO, Mitchell concluded that each individual bore some responsibility for the November 10, 2015 incident.  Mitchell Dep. at 26:11–37:9; *see* Def.'s SOF ¶ 4; Pl.'s Resp. to Def.'s SOF ¶ 4 (not disputing that Mitchell reviewed statements provided by witnesses).

On March 16, 2016, Mitchell proposed that each employee receive a seven-day suspension without pay.  Def.'s SOF ¶¶ 5, 8, citing Notice of Proposed Suspension; Pl.'s Resp. to Def.'s SOF ¶¶ 5, 8; Notice of Proposed Suspension at 1; *see also* Mitchell Dep. at 26:11–17.  In arriving at his recommendation, Mitchell "considered and sought guidance from the GPO Directive 655.4B," Notice of Proposed Suspension at 3–4, which is a guide that "provides notice and information to employees about the guidelines used by the agency in proposing and processing corrective actions."  GPO Directive 655.4B (Dec. 5, 2008), Ex. 9 to Pl.'s Opp. [Dkt. # 23-9] ("GPO Directive") ¶ 1.  Included in the GPO Directive is a "Table of Penalties," which "lists certain typical offenses and penalty ranges for first and subsequent infractions."  *Id.*  "This Table is intended only as a guide for use in determining the most appropriate charges and penalties . . . ."  *Id.* ¶ 15(a). "The penalty for a given offense may be less than the minimum penalty [recommended], or greater than the maximum penalty [recommended]."  *Id.* ¶ 15(b).  The

Directive advises that the "Table of Penalties must always be used in conjunction with consideration of all the Douglas factors, listed in Appendix A." *Id.* ¶ 15(a).[9]  These factors are:

1.   "The nature and seriousness of the offense . . . ;"

2.   "The employee's job level and type of employment . . . ;"

3.   "The employee's past disciplinary record;"

4.   "The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;"

5.   "The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;"

6.   "Consistency of the penalty with those imposed upon other employees for the same or similar offenses;"

7.   "Consistency of the penalty with any applicable agency table of penalties;"

8.   "The notoriety of the offense or its impact upon the reputation of the agency;"

9.   "The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;"

10.  "The potential for the employee's rehabilitation;"

11.  "Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment . . . ; and"

---

9       The "Douglas factors" were established in a decision from the Merit Systems Protection Board called *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981).  *See* App. A to GPO Directive at 9.  The factors comprise the "criteria that supervisors must consider in determining an appropriate penalty to impose for an act of employee misconduct."  *Id.*; *Douglas*, 5 M.S.P.R. at 305–06 (1981) (listing twelve factors and noting that "[n]ot all of these factors will be pertinent in every case, and frequently . . . some of the pertinent factors will weigh in the appellant's favor while others may not or may even constitute aggravating circumstances," and so "[s]election of an appropriate penalty must . . . involve a responsible balancing of the relevant factors in the individual case").

> 12. "The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others."

App. A to GPO Directive at 9; *see Douglas*, 5 M.S.P.B. at 305–06.  Mitchell's letter to plaintiff recounted that the Table of Penalties suggested a penalty range of "a Letter of Warning to a Long Suspension for the second offense of unprofessional or discourteous conduct toward . . . co-workers."  Notice of Proposed Suspension at 3–4.  Mitchell determined that "[a] proposed long suspension is within the bounds of reasonableness for the cited misconduct, however, . . . a 7-day suspension offers [plaintiff] another chance to correct [his] behavior."  *Id.* at 4.  After detailing the November 10, 2015 incident,[10] Mitchell listed the following factors as supporting his proposal:

---

10    Mitchell also included information about another set of events that occurred on January 20, 2016 and January 29, 2016.  Burke alleged that plaintiff intentionally blocked his walking path in the hallway at work and later "came 'at [him] in a threatening manner.'"  Notice of Proposed Suspension at 2–3.  Burke provided a sworn statement to a GPO Police Officer about the incidents on February 5, 2016.  *Id.*

1. Plaintiff's "past disciplinary record," which showed that plaintiff "had clear and consistent notice that [his] behavior was unacceptable." *Id.*[11]

2. "[M]itigating factors such as [plaintiff's] 7 years of Federal service and . . . successful performance . . . ." *Id.*

3. "[T]he severity and frequency of [plaintiff's] misconduct." *Id.*

4. "[C]onfidence in [plaintiff's] ability to maintain self-control." *Id.*

5. "[T]he clarity with which [plaintiff was] on notice that [his] actions were inappropriate and unacceptable, and that [his] conduct had a negative impact upon the workplace." *Id.*

6. Plaintiff's display of a "total lack of regard for, and refus[al] to adhere to the rules, policies, and directives of the U.S. Government Publishing Office." *Id.*

7. Belief that "this proposed suspension will promote the efficiency of the Federal service." *Id.*

Mitchell added that "[w]hile [plaintiff's] actions do not reflect a high potential for rehabilitation, [he] was somewhat hopeful that [plaintiff] will work toward correcting [his] behavior." *Id.*

---

[11]     On August 7, 2014, plaintiff received a "letter of warning" informing him that an aggressive outburst he directed to another employee was inappropriate and unacceptable. Letter from Michael H. Mooney, Manager, Quality Control & Inventory Mgmt., GPO, to James Harrington (Aug. 7, 2014), Ex. 2 to Decl. of LaTonya Hayes, Def.'s Mot. [Dkt. # 22-5] at 7–8. This letter also cautioned plaintiff that "any future misconduct may result in more severe disciplinary action, up to and including removal from Federal service." *Id.* at 2.

Burke also had a history of prior workplace discipline. On April 21, 2011, he was issued a letter of warning for using inappropriate language with a coworker. Letter from Gregory Estep, Manager, Press Operations, to Timothy B. Burke (Jan. 30, 2013), Ex. 6 to Pl.'s Opp. [Dkt. # 23-6] at 1. And on January 30, 2013, Burke was issued a letter proposing a fifteen-day suspension from his position based on the charge of "inappropriate behavior." *Id.* The proposal was later reduced to a five-day suspension. *Id.* at 2. In the letter proposing to suspend Burke for his role in the November 10, 2015 incident involving plaintiff, Mitchell cited Burke's disciplinary history: "In October 2012, you were suspended for five (5) days for inappropriate behavior conduct . . . ." Letter from Christopher Mitchell to Timothy Burke (Mar. 16, 2016), Ex. 6 to Pl.'s Opp. [Dkt. # 23-4] at 3. Further, the final decision as to Burke notes that he was "clearly on notice that future inappropriate conduct could result in more severe disciplinary action as stated in the Decision to suspend [him] for 5-days . . . ." Letter from Gary W. Evans, Manager, Press Operations, to Timothy B. Burke (June 16, 2016), Ex. 6 to Pl.'s Opp. [Dkt. # 23-4] at 1–2.

On March 24, 2016, plaintiff initiated another EEO complaint against defendant based on Mitchell's proposal to suspend him.  Harrington Dep. at 31:14–34:2.  Plaintiff alleged in his EEO complaint that Mitchell unlawfully discriminated against him on the basis of his race and retaliated against him based on his EEO complaint in February of 2014.  *See id.*

On June 9, 2016, GPO's departmental manager, Gary Evans, made the final decision to suspend Harrington, but "reduc[ed] Harrington's suspension to four days, spanning a period of Friday to Monday such that Harrington lost only two days of pay."  Def.'s SOF ¶ 9, citing Letter from Gary W. Evans, Manager, Press Operations, GPO, to James W. Harrington (June 9, 2016), Ex. 3 to Decl. of LaTonya Hayes, Def.'s Mot. [Dkt. # 22-5] ("Suspension Letter") at 2; Pl.'s Resp. to Def.'s SOF ¶ 9.  Evans mitigated the length of the suspension after accounting for the seriousness of the offense, plaintiff's years of service, past positive performance appraisals, job performance, confidence in his performance, and the sufficiency of the punishment.  Suspension Letter at 2; *see* Suspension Letter at 1 (Evans "sought guidance from GPO Directive 655.4B" and "considered the relevant factors consistent with *Douglas v. Veterans Administration* . . . and applied such factors to this action before reaching a final decision"); Excerpts of Dep. of Gary W. Evans, Ex. 7 to Def.'s Mot. [Dkt. # 22-7] ("Evans Dep.") at 39:4–40:4.[12]  Evans noted, though, that the proposed seven-day suspension also would "fall[] within the bounds of reasonableness" and was "consistent with penalties imposed upon similarly situated employees for similar offenses."  Suspension Letter at 2.  Evans also testified that he determined Burke's version of the

---

12    Plaintiff also submitted excerpts of Evans's March 26, 2021 deposition.  *See* Excerpts of Dep. of Gary W. Evans, Ex. 6 to Def.'s Mot. [Dkt. # 23-8].

events were "a small amount" more credible than plaintiff's telling of the story.  Evans Dep. at 38:2–11.

Burke's suspension was also reduced to four days.  Def.'s SOF ¶ 10, citing Evans Dep. at 36–40; Pl.'s Resp. to Def.'s SOF ¶ 10; Pl.'s SOF ¶ 13; Def.'s Resp. to Pl.'s SOF ¶ 13.

Plaintiff was suspended from June 24 through June 27, 2016.  Suspension Letter at 2; *see* Harrington Dep. at 44:4–13.  On June 10, 2016, plaintiff amended his March 2016 EEOC complaint to add a claim against Evans "based on his June 9th decision on the suspension," which plaintiff contends was issued "in reprisal for [his] prior EEO activity of February 2014."[13] Harrington Dep. at 44:22–46:16.  Plaintiff maintains that he should have received a "lesser penalty" than Burke because Burke "had a more severe history of discipline," and also that "[t]he deciding official . . . was required to consider the severity of the history of discipline when determining the penalty to impose."  Pl.'s Opp. at 2.

Almost a year later, on May 9, 2017, plaintiff and the GPO entered into a settlement agreement to resolve plaintiff's first EEO complaint that was filed in 2014.  Pl.'s SOF ¶ 1; Def.'s Resp. to Pl.'s SOF ¶ 1; Dismissal Order, Ex. 11 to Pl.'s Opp. [Dkt. # 23-11] at 1 (noting that agreement was "fully executed" and reviewed by an EEOC Administrative Judge).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the

---

13      As of December 30, 2016, Burke had not filed any complaints with the EEOC.  *See* Def.'s SOF ¶ 11, citing Decl. of LaTonya Hayes, Def.'s Mot. [Dkt. # 22-5] ¶ 5; Pl.'s Resp. to Def.'s SOF ¶ 11.

district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### The Law of Retaliation

Under Title VII, it is unlawful for "an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). A plaintiff must show that retaliation was a "but-for" cause of the adverse employment action, rather than just a substantial

or "motivating" factor in the employer's decision.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id*. at 360.

At the summary judgment stage, Title VII retaliation claims are also evaluated in accordance with the *McDonnell Douglas* burden-shifting framework that is used to evaluate claims of disparate treatment.  That is, a plaintiff must first establish a prima facie case of retaliation. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  Once the plaintiff has made that showing, the burden shifts to the defendant to produce a "legitimate" and "nondiscriminatory reason" for its actions.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (internal quotation marks omitted).    If an employer supplies such a reason, then the "burden-shifting framework disappears," and the Court must ask "whether a reasonable jury could infer . . . retaliation from all the evidence."  *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

To establish a prima facie case of retaliation, plaintiffs must present evidence that (1) they engaged in activity protected by Title VII; (2) the employer took an adverse employment action against them; and (3) the adverse action was causally related to the exercise of their rights. *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006).  An "adverse action" in the context of a retaliation claim is one that is "harmful to the point that [such action] could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57; *see Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006), and it is highly dependent on the "particular circumstances" of plaintiff's employment.  *Burlington N.*, 548 U.S. at 69; *see Chambers v. District of Columbia*, 35 F.4th 870, 877 (D.C. Cir. 2022).  The D.C. Circuit has noted that an actionable event is one that would "affect the employee's 'position, grade level, salary, or

promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009), quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).

If a plaintiff cannot make a showing of material adversity, the inquiry ends there. *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 92 (D.D.C. 2019) ("[A]t the summary judgment stage, [plaintiff] must still, at a minimum, demonstrate that she suffered an adverse employment action."), citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008), *aff'd Chambers v. District of Columbia*, 988 F.3d 497 (D.C. Cir. 2021)

With respect to the element of causation, in the absence of direct evidence of retaliation, courts may infer a causal connection between the protected activity and the adverse employment action on a showing that "the employer had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity." *Jones*, 557 F.3d at 679 (recognizing that this evidence tends to support circumstantial evidence of retaliation at the prima facie stage, and that it "applies to the ultimate inquiry as well"), citing *Holcomb*, 433 F.3d at 903. While there is no binding authority that has definitively established the precise time period that would support the necessary inference, it is well established that the temporal proximity between the two must be "very close" to show a causal connection. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001); *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (observing that the Supreme Court and D.C. Circuit have suggested that "a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation," but that there is technically no "bright-line three-month rule").

On a motion for summary judgment with respect to an actionable event, if the employer can "articulate some legitimate, nondiscriminatory reason" for the employment decision at issue,

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the district court no longer needs to assess whether the plaintiff made out a prima facie claim.  *See Jones*, 557 F.3d at 678, citing *Brady*, 520 F.3d at 494. Instead, the question before the court at that point would be whether plaintiff "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason" for the adverse action, and that the employer actually retaliated against the plaintiff.  *Brady*, 520 F.3d at 495.  In answering this question, though, "the strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation.  *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 n.4 (D.C. Cir. 1998).

"A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive."  *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

### The Facts of this Case

The only remaining count in plaintiff's complaint alleges that defendant unlawfully retaliated against plaintiff in violation of Title VII because there "was a causal connection between [p]laintiff's prior EEO activity and [d]efendant's issuance of a four-day suspension." Compl. ¶¶ 70–71.  Plaintiff alleges he "suffered and continues to suffer harm, including but not limited to lost wages, pecuniary damages, and nonpecuniary damages," as a result of the

disciplinary sanction.  Compl. ¶ 73.  Defendant asserts that it suspended plaintiff "based on his role in an incident involving unprofessional and discourteous conduct," and that the penalty was unrelated to plaintiff's prior "[EEO] activity as alleged in Count VI of the Complaint."  Def.'s Mot. at 1.  Defendant maintains that plaintiff has failed to establish a prima facie case of retaliation, Def.'s Mot. at 4–5, and that he cannot rebut GPO's legitimate, non-retaliatory reason for the suspension.  Def.'s Mot. at 6–7.

Because GPO has articulated a legitimate, nondiscriminatory reason for its decision to suspend plaintiff, the question before the Court is whether plaintiff "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason" for the adverse action, and that the employer actually retaliated against the plaintiff.  *Brady*, 520 F.3d at 495.  After considering plaintiff's attempt to establish pretext and the strength of his prima facie

case,[14] the Court finds that plaintiff has not come forward with evidence to create an issue for trial for the jury.

---

14      It is not clear that plaintiff has made out a prima facie case, so the strength of the prima facie case is not a significant factor in showing there is a material dispute regarding retaliation. *See Holmes-Martin*, 693 F. Supp. 2d at 152. There is no dispute that the four-day suspension without pay was an adverse employment action. *See* Def's Mot. at 4–5; *Taylor*, 571 F.3d at 1321. And plaintiff presented evidence that he engaged in activity protected by Title VII: he filed two EEO complaints. But the evidence of any causal connection between plaintiff's protected activity and the sanction he received in 2016 is weak.

The first EEO complaint was filed on February 25, 2014 – over a year and a half before the incident involving Burke. Pl.'s SOF ¶ 1, citing Harrington Dep. at 15:24–16:11; Def.'s Resp. to Pl.'s SOF ¶ 1; Notice of Proposed Suspension at 1. He filed another EEOC complaint on March 24, 2016, about a week *after* Mitchell had already proposed plaintiff's suspension in connection with the Burke incident. Harrington Dep. at 31:14–34:2; Notice of Proposed Suspension at 1. He amended the 2016 EEOC complaint on June 10, 2016, almost three months after Mitchell proposed to suspend him from his position and a day after Evans issued the final suspension letter for the four-day term. Harrington Dep. at 44:22–46:16; Notice of Proposed Suspension at 1; Suspension Letter at 1. Moreover, plaintiff has not introduced evidence that Evans was aware of the 2016 complaint when it was filed. Thus, plaintiff cannot point to his 2016 EEO activity as the but-for cause of the suspension that was already in the works.

As for the 2014 complaint, the chronology does not support an inference of a connection between plaintiff's activity and the discipline imposed in 2016. Plaintiff submits that there is a genuine dispute of material fact regarding when Mitchell became aware of his 2014 protected activity, and because Mitchell may have become aware of it at a later time, the two events may be connected. Pl.'s Opp. at 9. But the parties agree that Mitchell became aware of the 2014 EEOC complaint by, at the latest, November 10, 2015. Pl.'s SOF ¶ 2; Def.'s Resp. to Pl.'s SOF ¶ 2. It was not until March 16, 2016 – over four months later – that Mitchell proposed plaintiff's seven-day suspension without pay. Def.'s SOF ¶¶ 5, 8; Pl.'s Resp. to Def.'s SOF ¶¶ 5, 8; Notice of Proposed Suspension at 1. So even if one considers the latest possible date, the evidence does not support a presumption of causation based on temporal proximity, and the four-month period is not sufficient to overcome the legitimate explanation advanced for the suspension, particularly given the intervening incident that gave rise to the disciplinary action.

*Footnote continued on next page*

Both Mitchell and Evans concluded that plaintiff and Burke each bore some responsibility for the November 10, 2015 incident.  Mitchell testified that he consulted witnesses to the event, including both Harrington and Burke, who provided varying accounts that supported both employees.  Mitchell Aff. ¶¶ 9, 26; Mitchell Dep. at 26:18–24; *see also* Harrington Dep. at 35:13–36:3.  Mitchell also reviewed the complaints filed by both men and consulted with the Employee Relations Division before concluding that both employees were partially at fault.  Def.'s SOF ¶ 4; Mitchell Dep. at. 26:11–37:9.  Mitchell then considered the GPO Directive on penalties, plaintiff's prior disciplinary record, and mitigating factors, including plaintiff's seven years of federal service

---

Furthermore, the final decision maker was Evans, and it is unclear when, if ever, he became aware of the 2014 complaint.  Plaintiff contends that "Gary Evans, [p]laintiff's higher-level supervisor, became aware of [p]laintiff's prior EEO activity at some point prior to November 10, 2015," Pl.'s Opp. at 1–2, and cites to an "EEO Affidavit of Gary Evans."  *See* Ex. 2 to Pl.'s Opp. [Dkt. # 23-2].  This so-called EEO affidavit is excerpted from a larger document, and does appear to have come from Evans – it contains the initials "G.W.E." on the bottom of the page and says that the author is the "Complainant's fourth-level supervisor."  *Id.* ¶ 6.  But the document only contains a statement that the author was "possibly" aware that the complainant had prior EEOC activity prior to November 10, 2015.  *Id.* ¶ 7.   Nowhere does it identify the name of the complainant as James Harrington, and plaintiff does not appear to have submitted other evidence showing if and when Evans became aware of plaintiff's 2014 EEOC complaint.

Plaintiff also argues, though, that his "EEO activity was ongoing in nature as [p]lantiff and [d]efendant were engaged in active litigation until they entered a negotiated settlement agreement in May 2017."  Pl.'s Opp. at 9; Pl.'s SOF ¶ 1; Def.'s Resp. to Pl.'s SOF ¶ 1.  "[C]ourts should consider later protected activity in determining whether evidence of temporal proximity satisfies the causation element."  *Hamilton*, 666 F.3d at 1358.  Ongoing litigation of the EEO complaint, which plaintiff asserts resulted in "extensive litigation," Pl.'s SOF ¶ 1, could give rise to an inference of a causal connection between plaintiff's protected activity and the proposed suspension.  But plaintiff provides no evidence showing that Mitchell or Evans were aware of the ongoing discussions relating to the 2014 complaint.  And in his signed and sworn affidavit, Mitchell avers that he was "not aware of the details of the [2014] EEO complaint, and [was] only aware that there was an EEO complaint" at some point prior to November 10, 2015.  Mitchell Aff. ¶ 7.  Furthermore, even if the ongoing nature of the EEO proceedings shortened the timespan between the filing of the complaint and the suspension in 2016, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine" at the summary judgment stage.  *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011).

and successful job performance, and he proposed a seven-day suspension without pay as a sanction.  Notice of Proposed Suspension at 3–4; Mitchell Aff. ¶¶ 15–17.  Mitchell proposed that Burke be suspended for the same amount of time.  Mitchell Aff. ¶¶ 15–17.

Evans, the ultimate decision maker, testified that he suspended plaintiff and Burke because they were involved in a verbal altercation in the workplace.  Evans Dep. at 36:22–37:15.  In the suspension letter to plaintiff, he wrote that he "considered and applied all the relevant factors pertinent to the proposed action," including "all the facts presented in the Proposal [to Suspend] and the materials relied on to support the charges, and [plaintiff's] oral and written replies." Suspension Letter at 1.  Evans noted that the record of the event in question and plaintiff's prior employment history and disciplinary infractions reflected that his "inappropriate behavior appear[ed] to be intentional and has occurred more than once," and that plaintiff was "clearly on notice that future inappropriate conduct could result in more severe disciplinary action."  *Id.*  But Evans also explained that he reduced the suspension from seven to four days given plaintiff's years of service, past positive performance appraisals, and ability to perform his duties in a proficient manner.  *Id.* at 2; *see*  Evans Dep. at 39:12–13.

Plaintiff argues that defendant treated Burke "more favorably than [p]laintiff in the same situation."  Pl.'s Opp. at 13.  This contention has little support since the sanction originally proposed was exactly the same for the two participants in the argument, and the sanction that was in fact imposed was exactly the same.  *See* Def.'s SOF ¶¶ 9–10, Pl.'s Resp. to Def.'s SOF ¶¶ 9–10.

Plaintiff  contends that since Burke had a "significantly more serious disciplinary history" at GPO, Burke's sanction should have been more severe, and the parallel nature of the suspensions

is what makes his own suspicious and indicative of a retaliatory motive.  Pl.'s Opp. at 12.[15]  But this amounts to nothing more than an attempt by plaintiff to question the merits of GPO's employment decision, as opposed to evidence of a retaliatory animus.  The supervisors were plainly attempting to treat the two men involved – both of whom were on notice of a potential for stricter sanctions in the event of future disciplinary infractions – in an evenhanded fashion, given their shared responsibility for the disruption in the workplace.  GPO's Directive on disciplinary action permits agency decision makers to exercise discretion when imposing sanctions, *see* GPO Directive ¶ 15, and plaintiff has pointed to nothing that would tend to show that the reasons behind the sanction imposed were pretextual.[16]

---

15      Burke had been previously suspended for "inappropriate behavior" for a period of five days.  *See* Letter from Gregory Estep to Timothy B. Burke (Jan. 30, 2013), Ex. 6 to Pl.'s Opp. at 2. He had also been issued a letter of warning for using inappropriate language with another coworker.  *Id.* at 1.  Plaintiff, too, had previously received a letter of warning following an aggressive outburst directed at a colleague, *see* Letter from Michael H. Mooney to James Harrington (Aug. 7, 2014), Ex. 2 to Decl. of LaTonya Hayes, Pl.'s Opp. at 7–8, but had not been previously suspended.

16      Plaintiff also asserts that defendant "failed to follow proper procedure when considering prior disciplinary history when deciding on Burke's and Plaintiff's proposed suspensions" because Burke's record was not taken into consideration.  Pl.'s Opp. at 14, citing App. A to GPO Directive at 9.  But the letters proposing and determining Burke's punishment for the incident in question both account for Burke's prior suspension.  *See* Letter from Christopher Mitchell to Timothy Burke (Mar. 16, 2016), Ex. 6 to Pl.'s Opp. at 3; Letter from Gary W. Evans to Timothy B. Burke (June 16, 2016), Ex. 6 to Pl.'s Opp. at 1–2.

    Moreover, plaintiff neglects the fact that the Directive requires supervisors to also consider the "[c]onsistency of the penalty with those imposed upon other employees for the same or other offenses."  App. A to GPO Directive at 9.

**CONCLUSION**

In the absence of any evidence giving rise to a genuine dispute as to whether defendant's

proffered nondiscriminatory reasons for suspending plaintiff were pretextual, defendant's motion

for summary judgment on plaintiff's retaliation claim will be **GRANTED.**

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE:  September 15, 2022